## Commonwealth v. Ford Motor Co.

*William A. Seifert*, of *Reed, Smith, Shaw & McClay*, and *George Ross Hull*, of *Snyder, Hull, Leiby & Metzger*, for appellant.

*Frank A. Sinon*, Deputy Attorney General, and *Claude T. Reno*, Attorney General, for Commonwealth.

HARGEST, P. J., May 14, 1941.—This case comes before us upon appeal from the settlement of a foreign franchise tax against defendant company, imposed by section 21 of the Act of June 1, 1889, P. L. 420, as amended by the Act of May 16, 1935, P. L. 184, 72 PS §1871. The case was tried without the intervention of a jury.

The facts have been fully found in answer to requests, and only so much of them as are necessary to the discussion of the issues are repeated in this opinion. Many questions were raised in this case which have been settled by the case of Commonwealth v. Columbia Gas & Electric Corp., 47 Dauph. 133, 336 Pa. 209.

### Questions involved

Two principal questions are before us for decision.

1. Has defendant complied with section 1104 of The Fiscal Code of April 9, 1929, P. L. 343, 72 PS §1104?

2. The Commonwealth contends that defendant is engaged in a unitary enterprise. Defendant contends that it is engaged in four lines of corporate activity, and only two of them in Pennsylvania. In construing the fractions under the Foreign Franchise Tax Act of May 16, 1935, P. L. 184, should (a) the denominators consist of the value of all tangible property, the total wages, salaries and compensation to employes, and the total gross receipts, or only such proportion of those three items which is attributable to the two phases of corporate activity done in Pennsylvania, and (b) should the multiplicand consist of the value of the whole capital stock of all kinds, or only that part of the capital stock which is attributable to the two phases of corporate activity done in Pennsylvania?

### Discussion

1. Section 1104 of The Fiscal Code, providing the machinery for appeals from the settlement of taxes, enacts:

"Appeals taken hereunder shall be hearings de novo, but *no facts* shall be admitted in evidence that were not brought to the attention of the department making the settlement, *or* in the application for resettlement, *or* petition for review prior to the appeal, *and* set forth in the specification of objections contained in the affidavit accompanying the appeal, unless the court shall be satisfied that the appellant was unable, by the exercise of reasonable diligence, to have laid such evidence before the department making the settlement and the Board of Finance and Revenue, and no questions shall be raised which are not included in the specification of objections filed as hereinbefore provided." (Italics supplied.)

In the case of Commonwealth v. The Union Trust Company of Pittsburgh, 50 Dauph. 266, we had occasion to construe this statute. The specification of objections referred to in this statute is to be regarded as a pleading: Commonwealth v. Western Land & Improvement Co., 156 Pa. 455, 466; Commonwealth v. The Union Trust Company of Pittsburgh, supra.

Section 11 of the Act of March 30, 1811, P. L. 145, provided that every appeal filed in the office of the Auditor General "be accompanied with a specification of objections to said settlement".

Section 2 of the Act of April 9, 1913, P. L. 48, 72 PS §4143-44, was almost identical with the provision above quoted from The Fiscal Code, except that a petition for review was not referred to because there was no such procedure at that time.

The writer, having been a Deputy Attorney General in charge of tax matters, knows the history of the Act of 1913. Thousands of settlements were made at conferences with a representative of the State Treasurer, the Auditor General, the Attorney General, and counsel for the taxpayers. No effort at concealment was indulged in, but in rare instances some positions were asserted in the trial of the case de novo in court which

had not been brought to the attention of the accounting officers, and this was the occasion for the Act of 1913, so that the Commonwealth, in pressing its claim, should not be taken by surprise. After the passage of the Act of 1913 the settlements were made in the same way and no strict construction of the act was ever asserted. No case was ever brought to the attention of this court until the case of Commonwealth v. The Union Trust Company of Pittsburgh, supra, decided January 13, 1941.

Section 58 of article IV of the Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS §558, declares that procedural statutes "shall be liberally construed to effect their objects and to promote justice".

With that principle in view, we again approach the interpretation of section 1104 of The Fiscal Code. The Commonwealth, in its brief, says:

"In the instant case, no facts such as are voluminously revealed in the record were presented to the departments, if it be conceded arguendo that these facts were presented, this court need only observe the specification of objections to ascertain that it is entirely devoid of facts reflected by the record."

This statement confuses "facts" and "evidence", and we have called attention to the misconstruction in the Union Trust Company case. The statute does not require all the "evidence" to be brought to the attention of the accounting officers, as the quotation above referred to indicates; it requires only the facts to be disclosed.

The statute requires the facts to be (1) brought to the attention of the department making the settlement; (2) in the application for resettlement; or (3) petition for review; and (4) set forth in the specification of objections. Certainly the facts must be presented in two ways. However, whether they be presented in the ways indicated above (1), (2), or (3), they must also be presented in the specification of objections.

We are confronted in this case with the question as to whether the facts may be orally brought to the attention of the department, and certainly the first clause of the statute does not require them to be in writing. Numbers (2), (3), and (4) do require them to be in writing, so that we definitely hold that if the facts are brought to the attention of the department orally it is one step in complying with the statute.

The question now is whether the first step of bringing them to the attention of the department has been complied with. The Attorney General's brief says:

"There was no scintilla or trace of the evidence which they now attempt to introduce furnished to the Department of Revenue or to the Board of Finance and Revenue . . . and because the evidence was not indicated by the specification of objections which the defendant has filed."

Here again is the misconception that the statute requires the evidence to be submitted. There is no machinery for any of these boards examining witnesses, although they may subpœna officers with their books and papers.

The evidence in this case shows that Leon Metzger, attorney for defendant, presented to the accounting officers the position taken by defendant, and particularly the make-up of the fraction which he contended for. After discussing the assets and capital stock valution applicable to Pennsylvania, Mr. Metzger testified:

"Then I went on to explain that the Ford Motor Company did only a certain part of its total business in Pennsylvania. And as I recall it, I described that as selling and assembling; I don't think I went into any further detail than that, selling and assembling. I pointed out, however, that the corporation carried on extensive investment activities outside of Pennsylvania; that it had its manufacturing plants outside of a wholly different character than inside; that it had mines and foundries and machine shops, and a

great deal of property outside that had to do with manufacturing of a different character than was done inside of Pennsylvania. I also explained . . . that the purchasing activities of the company were carried on outside of Pennsylvania . . . and that there was no purchasing in Pennsylvania except such as might be incidental to the activities carried on here which were relatively nominal."

After cross-examination, in which he said that he did not divide the activities of the company, as the Deputy Attorney General in questioning him had done, but that he did show "how these intangibles [of the company outside Pennsylvania] did not find any business representation in the denominator of the three fractions." The testimony continued:

"Q. Mr. Metzger, did you in the course of your presentation of the case to the Board of Finance and Revenue make the contention that the franchise tax of Ford Motor Company should be based upon the capital employed in the kind of business done by the company in this State?

. . . . . . . . . .

A. I did do that, and I attempted to do that at the time I explained the amount of tangible property invested here and the amount of intangible here, and then converted those assets into capital stock value. I attempted to explain that they were incident to selling and to assembling. I believe those were the only two words I used—selling and assembling.

Q. You didn't omit the discussion of the assembling, you mentioned assembling in referring to Pennsylvania operations?

A. No, I included it with the assembling."

We are of opinion that Mr. Metzger did bring to the attention of the department facts in substantial compliance with the statute, sufficient to raise the legal questions now involved.

Moreover, the testimony shows that Thomas M. Miller, an investigator of the Commonwealth, spent

four weeks in June 1938, before the resettlement was made on December 21, 1938, at the home office of the company. Another investigator, Charles S. Seligman, went to the home office in November 1939, just before the trial of this case. Certainly, with the statement of Mr. Metzger and the subsequent investigation of Mr. Miller, the Commonwealth could not have been taken by surprise.

The next question is whether the facts required by the statute were "set forth in the specification of objections." This is a pleading and the evidence is not required to be set out in detail. This specification sets forth in two paragraphs, 11A and 12A, that the effect of the settlement is "to impose a tax, to be collected by and paid to the State of Pennsylvania, upon property of the appellant which has its situs outside the territorial limits of the State of Pennsylvania and which is beyond the taxing power and authority of the State of Pennsylvania."

It also sets forth in paragraphs 16A and 17A that the settlement is unconstitutional because "the manner of ascertaining the taxable value of appellant in Pennsylvania, upon which the so-called franchise tax is based, involves the use of a formula prescribed by the act having a purely arbitrary basis and having no relation to the business done or receipts from capital or property employed or used by the appellant in Pennsylvania."

Another paragraph, no. 18, states that the resettlement is illegal and void "for the reason that the allocation applied to the whole capital stock of the appellant to determine the part attributable to Pennsylvania . . . results in apportioning to Pennsylvania for taxation property beyond its jurisdiction."

The petition for resettlement, which is attached to and made part of the specification of objections, avers that the tax is excessive "because, as stated in the 1935 report filed by the company, it had in Pennsylvania

tangible property of the value of only $7,196,685.75. It, therefore, appears that with assets in Pennsylvania of $7,196,685.75, we are taxed with respect to capital stock in the amount of $21,299,982. This method adopted therefore allocates to Pennsylvania a much larger amount of assets than are legally assignable to that State."

The principal question in this case is whether the defendant was engaged in a unitary business so as to justify the use of the whole capital stock as a multiplicand in the allocation fractions. While it is true that neither Mr. Metzger's testimony nor the specification of objections seems to use the word "unitary", yet the quotation taken above from the specification refers specifically to the fact that the formula is arbitrary and has no relation to the business done or receipts from capital or property employed or used in Pennsylvania. It would be somewhat of a refinement of argument to say that this did not bring to the attention of the accounting officers the fact that the company complained that the Commonwealth was reaching out and taxing the business of the company done elsewhere which was not connected with the Pennsylvania activities.

We are, therefore, of opinion that the specification of objections complies with the statute.

Assuming, however, that this may not be so, what should be done? Should the court have refused the evidence and entered summary judgment for plaintiff? The exaction of taxes is not a game of chess. Summary judgments are not favored. The effort should not be to secure something by technical means to which the Commonwealth is not entitled, but to ascertain the facts and require payment of whatever the Commonwealth should receive. And having received the evidence, even if erroneously admitted, which may show that a grave injustice would be done, should summary judgment be entered? We think not. We are of

opinion that if we were not satisfied that the statute had been followed, under the case of Commonwealth v. Columbia Gas & Electric Corp., supra, the settlement should be referred back to the Department of Revenue for the purpose of making a resettlement. That would be so where the Commonwealth pleads surprise. In the instant case, however, there is no plea of surprise, and we conclude that the provisions of section 1104 of The Fiscal Code have been satisfied. We recognize what we have last said is in the nature of dicta, but inasmuch as this is only the second time that section 1104 of The Fiscal Code has come before the court for interpretation the expression of this opinion may be useful in future litigation.

2. Does the settlement in this case by the use of all the tangible property, the total wages, salaries, etc., the total gross receipts as denominators of the three allocation fractions, and of the value of the whole capital stock as the multiplicand, result in arbitrarily bringing into the State for taxation property of the defendant which cannot constitutionally be brought in for the purpose of calculating the tax?

### Facts

The Ford Motor Company, a Delaware corporation, during the year 1935 had its principal office and place of business at Dearborn, Mich., which was its business and commercial domicile. It received a certificate of authority under the Pennsylvania Business Corporation Law of May 5, 1933, P. L. 364, 15 PS §2852, authorizing it to do business in this State in the "manufacturing and sale of automobiles and parts thereof."

During the tax year it was engaged in four lines of corporate activity: (1) The purchase and production of raw material; (2) the manufacture of steel, glass, cement, paint, forgings, tools, dies, automobile parts, coke, benzol, and other manufactured products; (3) assembling of automobile parts into finished auto-

mobiles ready for sale; and (4) the sale and servicing of the finished automobiles.

The first two of these activities were wholly outside of Pennsylvania. The purchasing was done at Dearborn. Much of the activities indicated in the second branch were at Dearborn. There were lumber properties, quarries, and an iron mine in Michigan, lead mines in Idaho, and garnet mines in New Hampshire. Paint was manufactured at a plant in Michigan, wheels at a plant in Ohio, and radiator cores at a plant in New York. Defendant has from 16 to 18 plants, one of which is at Chester, Pa. It has also a number of sales and service depots, one of which is at Chester and another at Pittsburgh, Pa. At the assembling plants various parts of the finished automobile are received and stored. The assembling is done and the body upholstered and painted and the car made ready for delivery. Many of the parts are manufactured as above indicated at plants in other States. The average number of the employes at the Chester plant in 1935 was 3,100, and Pittsburgh 100.

Defendant maintained bank accounts of four kinds: (1) Branch managers' working funds; (2) treasurer's accounts; (3) active accounts; and (4) dormant accounts. The first one was the only one from which any local employe could withdraw funds. The other three could be drawn only by the officers at Dearborn, Mich.

The branch managers' working funds were maintained at places where the defendant had assembling plants or sales and service depots, were used for payrolls or other expenses incident to the operation of the local business, and were withdrawn on checks by the branch manager. The funds were obtained by him upon requisition to Dearborn.

The treasurer's accounts were maintained where the company had a sales or service depot, and in these accounts all the cash received from sales was deposited

and the money withdrawn from time to time by the officers at Dearborn.

The active accounts were maintained in various banks in which both deposits and withdrawals were made by officers at Dearborn.

The dormant accounts were also accounts in which deposits and withdrawals were made only by officers at Dearborn, and they were used as depositories of the reserve cash from which there were few withdrawals.

The book value of the assets in the tax year was $681,549,928, and the actual value of the capital stock appraised by the officers of the company and the taxing officers in the resettlement was $498,428,150, or 73.13 percent of the asset value. The assets include stocks of foreign corporations, $66,413,152, being subsidiary and affiliated companies, in all but four of which defendant owns the entire capital stock. The total book value of these assets is $64,849,576. None of these corporations has any property or transacts any business in Pennsylvania. Defendant also owns shares in other corporations of a book value of $1,563,576. The assets included United States securities, municipal and State securities, and cash in excess of $226,000,000, which are employed in the purchasing and manufacturing business in Michigan and not employed in Pennsylvania.

The net book value of the tangible property in Pennsylvania was $7,196,685, and of the capital stock value of that property 73.13 percent was $5,263,049. In addition to this tangible property the defendant used intangible property in its business in Pennsylvania in the amount of $681,219, including cash, accounts receivable, prepaid insurance, which made the total assets in Pennsylvania $7,877,905.04, and the capital stock value of them $5,761,235.49. This business might have been incorporated as a separate corporation with these assets and functioned in Pennsylvania.

The total book value of the company's assets employed everywhere in the business of assembling cars and in sales and service was $123,607,362.19. The capital stock value of these assets, calculated on a strictly mathematical basis, was $90,396,002.25. In Pennsylvania the tangible property was $7,196,685.75, the wages paid were $4,625,125.48, and the receipts $45,927,254.89.

The resettlement used the following figures, in which the denominators represented: (1) All the tangible property wherever situate; (2) all wages, salaries, and compensation; and (3) all gross receipts; and the multiplicand, value of the whole capital stock as follows:

(1) $\dfrac{7,196,685}{301,110,025} \times 1/3$ of $498,428,150 = \$ 3,970,896.$

(2) $\dfrac{4,625,125}{167,346,984} \times 1/3$ of $498,428,150 = 4,591,481.$

(3) $\dfrac{45,927,254}{835,626,384} \times 1/3$ of $498,428,150 = 9,131,447.$

Taxable Value, $17,694,184.
Tax at .005      $88,470.92

We have found that the tangible property assignable to the two phases of business transacted in Pennsylvania is $112,198,456.20, the wages, salaries, etc., assignable to the business in Pennsylvania $54,259,116.96, and the gross receipts so assignable $715,703,270.22; the value of the capital stock assignable to the phases of operation in Pennsylvania on a strictly mathematical basis is $90,396,002.25.

Defendant contends that the allocation fractions should be as follows:

(1) $\dfrac{7,196,685.75}{112,198,456.20} \times 1/3$ of $\$90,396,002.25 = \$1,932,740.86$

(2) $\dfrac{4,625,125.48}{54,259,116.96} \times 1/3$ of $90,396,002.25 = 2,568,495.25$

(3) $\dfrac{45,927,254.89}{715,703,270.22} \times 1/3$ of $90,396,002.25 = 1,933,594.74$

Total taxable value      $6,434,830.85

Defendant has paid the sum of $31,225.54, leaving a balance due of $57,215.38.

### Discussion

The statute involved in this case is the Foreign Franchise Tax Act of May 16, 1935, P. L. 184, 72 PS §1871, imposing a foreign franchise tax upon corporations in lieu of the capital stock tax theretofore imposed. The statute provides in part for a tax ascertained in the following manner (sec. 21(b)):

"The actual value of its whole capital stock of all kinds, including common, special, and preferred, shall be ascertained in the manner prescribed in the 20th section of this act, and shall then be divided into three equal parts."

Then three fractions are set up: (1) The numerator consisting of the value of the taxpayer's tangible property situate within the Commonwealth and the denominator all of the tangible property wherever situate; (2) the numerator the expenditures by the taxpayer for wages, salaries, and compensation of employes assignable to this Commonwealth, and the denominator the total of such wages, salaries, and compensation; and (3) the numerator the gross receipts received in this Commonwealth, the denominator the total gross receipts from all business. The multiplicand of each fraction is the "actual value of its whole capital stock of all kinds." The sum of the amounts determined in accordance with the foregoing three rules shall be the taxable value.

Defendant contends that it is unconstitutional to take as denominators of the fractions the whole tangible property, the total wages and salaries, and the entire gross receipts, and as the multiplicand the value of the entire capital stock, and that only that portion of each of those factors which is directly applicable to the business in Pennsylvania may be used in obtaining the taxable value. According to defendant, the taxable value should be $6,434,830.85, and not $17,694,184.

This case is difficult. It involves (a) the question whether defendant is engaged in a "unitary" business and, if so, whether its outside activities may be regarded as reflected in the business here, so as to allocate to Pennsylvania its whole property, wages, gross receipts, and capital stock in the allocation fractions to ascertain the taxable value of the franchise, or (b) even if engaged in a unitary business, where the facts are shown with reasonable certainty, must there be, for tax purposes, a separation of the items attributable to the business within and without the State?

Defendant raised many constitutional questions which have been settled in the case of Commonwealth v. Columbia Gas & Electric Corp., 336 Pa. 209. We will not discuss those questions but determine them in answers to the requests for findings of fact and conclusions of law filed of record.

The Columbia Gas case sustained the validity of the statute. The only question before us is the validity of the settlement, which involves the extent to which the capital stock of foreign corporations may be constitutionally allocated to Pennsylvania for tax purposes. The Columbia Gas case involved the taxation of a foreign corporation which was a holding company. Practically all of its holdings, with the exception of the holdings of four corporations doing a small business in Pennsylvania, were outside the Commonwealth. That case decided that the tax imposed under the statute was a franchise tax, and that "where the intangibles are a necessary part of the corporate activity and are within the scheme of corporate functioning, actively or as reserve, they may be included".

In the course of the opinion it is said (p. 220) :

"Moreover, the intangible worth of a going corporation as well as intangible assets themselves may be said to have some degree of correlation as to situs with tangibles. It was undoubtedly within the power of the legislature to permit this correlation to be worked out

through the use of a fraction which considered tangible assets only, leaving a more exact correspondence to be brought about through the interaction and effect of the other fractions composed of gross receipts and payrolls."

And at page 221:

"The Act provides for the ascertainment of taxable value by a measure. In its process it applies allocating fractions to each foreign corporation's *entire capital stock value. These fractions, as stated above, concern corporate activity. While they bear some relation to capital stock value, intrinsically they determine the taxable value of the corporate activity within this State rather than of the property located here. That it is the value of the franchise rather than the actual value of the property which is taken into account is clear from the factors which enter into the apportionment.* They are the same which this Court considered in *Turco Paint & Varnish Co. v. Kalodner*, 320 Pa. 421, where income was the fundamental base. *It does not ascertain physical worth of assets located in this State, but arrives at a value which the functional or operating organic unit within this State possesses. It represents what the right to do business is worth. It must follow that the tax is not levied on property but on the franchise to do business measured by a taxable value secured through the application of the factors of gross receipts, tangibles and payrolls to the capital stock value. It is representative of the value of that very franchise.*"

And at page 222:

"In applying the formula set up by the legislature, since the value of the capital stock is used as a measure, the taxable value of the franchise must have some relation to the business done in the taxing state. The Supreme Court of the United States in a number of cases has held that in fixing the taxable value with reference to property and business done within the state where

capital stock is used as a measure, the property without the state may be taken into consideration only if it is an organic or functional part of that within the state. . . . *Where the intangibles are a necessary part of the corporate activity and are within the scheme of corporate functioning, actively or as reserve, there is no reason why they should not be included.* If the intangibles acquire a business situs, they, of course, are properly included." (Italics supplied.)

The inference from the above quotation is that there is no constitutional inhibition to the use of the whole capital stock as a multiplicand in applying the prescribed statutory fractions. It must be borne in mind that this is a franchise tax, and the thing taxed is the right to do business.

In Southern Realty Corp. et al. v. McCallum et al., 65 F.(2d) 934, 936, in which certiorari was denied, 290 U. S. 692, it is said:

"That a state may impose such a franchise or business privilege tax, and may measure it by the capital stock and surplus used by the corporation in its business or by its income therefrom, although business is done in more states than one, without unconstitutional interference with interstate commerce or other federal prerogative and without a taxing of property beyond the jurisdiction of the taxing state, *when the capital by which the tax is measured is reasonably apportioned according to the business there done,* is settled by many decisions." (Italics supplied.)

In Great Atlantic & Pacific Tea Co. et al. v. Grosjean et al., 301 U. S. 412, 425, it is said:

"In legal contemplation the state does not lay a tax upon property lying beyond her borders nor does she tax any privilege exercised and enjoyed by the taxpayer in other states. *The law rates the privilege enjoyed in Louisiana according to the nature and extent of that privilege in the light of the advantages, the capacity, and the competitive ability of the chain's*

*stores in Louisiana considered not by themselves, as if they constituted the whole organization, but in their setting as integral parts of a much larger organization.* We cannot hold that this privilege is unaffected by the status of the Louisiana stores as members of such a chain or that recognition of the advantages and capacities enjoyed by them as a result of that membership is forbidden in classifying them for progressive increase of rate. Such classification is not in legal effect the taxation of property or privileges possessed or enjoyed by the taxpayer beyond the borders of the state." (Italics supplied.)

In the consideration of this question we are met by two distinct classes of cases. Many cases are referred to in the briefs on both sides. From them we shall only refer to cases involving an income or foreign franchise tax.

Defendant contends that the business of the Ford Motor Car Company is not a unitary business and that the business in Pennsylvania is distinct and separate from that carried on elsewhere, and, even if it be a unitary business, it would be an arbitrary and unconstitutional application of the act to allocate to Pennsylvania, for use in the statutory fractions, the whole tangible property, wages, gross receipts, and capital stock, when by a process of accurate calculation much less of each of these items—in the case of the capital stock only approximately one fifth of it—could be allocated to the business done here.

Defendant has cited a number of cases divided into three groups: (1) Those in which the State has imposed directly a property tax, of which Fargo v. Hart, 193 U. S. 490, is illustrative; (2) those in which the State has imposed a property tax directly by levy on capital stock, of which Adams Express Co. v. Ohio State Auditor, 165 U. S. 194, 222, is a typical case; and (3) those in which the State has imposed a franchise tax and adopted as its measure that property,

gross receipts, net income or the like, of which Wallace et al. v. Hines et al., 253 U. S. 66, and Standard Oil Co. v. Thoresen et al., 29 F. (2d) 708, are typical cases.

In Fargo v. Hart, supra, the company had over $3,-000,000 worth of real estate and about $1,500,000 worth of personal property used in connection with its business in Indiana. In addition, it had $2,000,000 worth of real estate located outside and $15,500,000 worth of personal property at its domicile in New York, none of which property was employed in the express company business being transacted in Indiana. The tax commissioners treated the entire business as a unit and included all of its property within and without the State, and assessed a tax based upon the ratio of mileage in Indiana to the total mileage of the company. Mr. Justice Holmes said, among other things (pp. 499 and 500):

"The use of the value either of total stock or total assets is only as a means of getting at the true cash value of property within the State. . . .

"But it is recognized in the cases that if for instance a railroad company had terminals in one State equal in value to all the rest of the line through another, the latter State could not make use of the unity of the road to equalize the value of every mile. That would be taxing property outside of the State under a pretense [citing cases]."

The tax was held invalid. It must not be overlooked that the case cited involved a property tax and none of the property outside of Indiana was employed in the business done in the State. This is altogether different from the instant case, where the machinery is partly manufactured outside and partly inside the State.

In the case of Adams Express Co. v. Ohio State Auditor, supra, Mr. Chief Justice Fuller used language which we think distinguishes that case from the instant case. He said (p. 222):

"We repeat that while the unity which exists may not be a physical unity, it is something more than a mere unity of ownership. It is a unity of use, not simply for the convenience or pecuniary profit of the owner, but existing in the very necessities of the case —resulting from the very nature of the business.

"The same party may own a manufacturing establishment in one State and a store in another, and may make profit by operating the two, but the work of each is separate. The value of the factory in itself is not conditioned on that of the store or *vice versa*, nor is the value of the goods manufactured and sold affected thereby. The connection between the two is merely accidental and growing out of the unity of ownership. But the property of an express company distributed through different States is as an essential condition of the business united in a single specific use. It constitutes but a single plant, made so by the very character and necessities of the business."

This is language particularly pertinent to the manufacture and sale of automobiles, part of which is done outside and part inside the State.

In Wallace et al. v. Hines et al., supra, a special franchise tax was involved. The measure of the tax was the entire stock and bond issues of the railroad company allocated upon the mileage basis. It appeared that the real value of the railroad per mile within the State of North Dakota was less than the amount which would be produced as the result of an allocation of the whole value upon the mileage basis, because the cost of construction in North Dakota was materially less than that in other States and the company had valuable terminals outside the State and personal property of considerable value outside, neither of which added substantially to the value of the road in North Dakota. The court there held that the tax imposed was unconstitutional for two reasons, namely, that the mileage basis was inapplicable and because it included valuable

real estate and personal property outside the State which did not form part of the organic unit. The court, speaking through Mr. Justice Holmes, said (pp. 69 and 70):

"The only reason for allowing a State to look beyond its borders when it taxes the property of foreign corporations is that it may get the true value of the things within it, when they are part of an organic system of wide extent, that gives them a value above what they otherwise would possess. . . . Therefore no property of such an interstate road situated elsewhere can be taken into account unless it can be seen in some plain and fairly intelligible way that it adds to the value of the road and the rights exercised in the State. Hence the possession of bonds secured by mortgage of lands in other States, or of a land-grant in another State or of other property that adds to the riches of the corporation but does not affect the North Dakota part of the road is no sufficient ground for the increase of the tax—whatever it may be—whether a tax on property, or, as here, an excise upon doing business in the State."

This case would seem to be somewhat in point, but the distinguishing characteristic is not only the personal property outside the State but the large and valuable terminals outside the State, even though the running of the railroad as a unitary business could hardly be considered, in the language of the court, to "affect the North Dakota part of the road."

In Standard Oil Co. v. Thoresen et al., supra, the State of North Dakota levied an income tax on all domestic and foreign corporations. The Standard Oil Company was engaged in a number of States in the production, transportation, refining, and marketing of oil. The only branch of its business in North Dakota was the marketing of refined oil. The company contended that the statutory formula should be applied only to that part of its business. The State contended that it should be applied to the entire business. The com-

pany's contention was sustained. The court said (pp. 710 and 711) :

"Does the law of the state of North Dakota require the plaintiff to pay taxes on its producing and refining oil business done altogether in states other than that state because of the fact it is engaged in the business of marketing refined oils in that state? . . .

*"In the first place, we are of the opinion from a reading and consideration of the many cases controlling here, the Legislature of the state in enacting the statute above quoted did not intend to impose a tax on the property of the plaintiff company or its income arising from the doing of business other than the character of business done in the state of North Dakota, that is, selling oil in that state. . . .*

"In some cases the unit theory of taxation attempted to be here applied is all right and has been upheld by the Supreme Court of our country in such cases as Underwood Typewriter Co. v. Chamberlain, Treasurer of State of Conn., 254 U. S. 113, 41 S. Ct. 45, 65 L. Ed. 165, and in Adams Express Co. v. Ohio, 165 U. S. 194, 17 S. Ct. 305, 41 L. Ed. 683. . . .

"There is a unity of use of the different appliances and agencies employed by the express company, and on this ground the tax of Ohio was upheld; but the right of the plaintiff or any other corporation or citizen to engage in different character of business in different states, or in the same state, must be conceded. The plaintiff in this case is engaged in the production of crude oil in those states wherein crude oil is found. There is no crude oil discovered in the state of North Dakota. The plaintiff has also engaged in the manufacture or refining of crude oils in many states, but has not done so in the state of North Dakota. It has engaged in marketing refined oil alone in that state. On its properties within the state of North Dakota employed in the business of marketing oil, and on the income arising from the doing of that business within

the state of North Dakota it may be there taxed by the state and the tax must be paid." (Italics supplied.)

This case is clearly distinguishable from the instant case. It would be clearly applicable if the Ford Company were only selling motor cars in Pennsylvania as the Standard Oil Company was only selling oil in North Dakota. If the Standard Oil Company had reserved the last processes of its refining oil business and engaged in those processes in North Dakota, as the Ford Company has reserved the last processes of its manufacturing business, which it does in Pennsylvania, we think the decision would have been different.

The Commonwealth relies upon Maxwell, etc., v. Kent-Coffey Mfg. Co., 204 N. C. 365, 168 S. E. 397, affirmed in 291 U. S. 642, Hans Rees' Sons, Incorporated, v. North Carolina ex rel., 283 U. S. 123, Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113, Bass, Ratcliff & Gretton, Ltd., v. State Tax Commission, 266 U. S. 271, Montgomery Ward & Co. v. State Tax Comm. et al., 151 Kan. 159, 98 P. (2d) 143, S. S. Kresge Co. v. Bennett et al., 51 F. (2d) 353, affirmed 287 U. S. 565, Ford Motor Co. v. Clark et al., 100 F. (2d) 515, and Ford Motor Co. v. Beauchamp et al., 308 U. S. 331.

In the Maxwell case, supra, the court said, with reference to unitary business, 168 S. E. 400:

"That term is simply descriptive, and primarily means that the concern to which it is applied is carrying on one kind of business—a business, the component parts of which are too closely connected and necessary to each other to justify division or separate consideration, as independent units. . . .

"Conceding that a unitary business may produce an income which must be allocated to two or more states in which its activities are carried on, such a business may not be split up arbitrarily and conventionally in applying the tax laws. . . . The bare fact of sale produces no income. It is merely the act by which the

income is captured; the capital, the organization, or efforts which produce the sale, are the things to be considered in ascertaining the amount of income to be credited to the sale. Certainly, in a unitary business, we must look further back than to the sale itself or the activities which actually produce it."

In the Hans Rees' Sons case, supra, an income tax upon a foreign corporation was involved. The company was engaged in tanning, manufacturing, and selling belting and other heavy leathers. It had one tannery and manufacturing plant in North Carolina and maintained a warehouse and sales office in New York. There was no method of apportionment in the taxing act such as exists in the Pennsylvania statute. The tax was declared invalid on the theory that the imposition resulted in all of the company's net income being brought into the State of North Carolina for taxation, without a valid apportionment method.

In the Underwood Typewriter case, supra, the statute of Connecticut, similar to that in North Carolina involved in the Maxwell and Hans Rees' Sons cases, supra, imposed a tax on net income by statutory formula. The company was engaged in the manufacture of typewriters, all of which manufacturing was done in Connecticut. The court said (p. 120):

"The profits of the corporation were largely earned by a series of transactions beginning with manufacture in Connecticut and ending with sale in other States. In this it was typical of a large part of the manufacturing business conducted in the State. The legislature in attempting to put upon this business its fair share of the burden of taxation was faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders. It, therefore, adopted a method of apportionment which, for all that appears in this record, reached, and was meant to reach, only the profits earned within the State."

In the Bass, Ratcliff & Gretton, Ltd., case, supra, a pure franchise tax measured by net income was involved. The court said (p. 282) :

"So in the present case we are of opinion that, as the Company carried on the unitary business of manufacturing and selling ale, in which its profits were earned by a series of transactions beginning with the manufacture in England and ending in sales in New York and other places—the process of manufacturing resulting in no profits until it ends in sales—the State was justified in attributing to New York a just proportion of the profits earned by the Company from such unitary business."

In the case of Ford Motor Company v. Clark et al., 100 F.(2d) 515, the franchise tax was measured by defendant's capital, surplus and undivided profits, plus outstanding notes and bonds running for more than a year. The company contended that because it manufactures and sells automobiles, the principal manufacturing thereof and capital necessary therefor being in Michigan, the gross income from sales was an arbitrary basis. The court said, inter alia (p. 517) :

"When business is done also in other states, so that the business potency inherent in the capital is thus divided, it is not arbitrary to apportion the capital which is to measure the tax in proportion to the income realized in the taxing State. . . . The object of the whole corporate enterprise is to make money. The corporation has made none by manufacture until it sells the product. . . . And it must be remembered that in this case part of the manufacture occurs in Texas. The machines are assembled and finished there. If it be practicable to separate the manufacturing from the selling activities, and the manufacturing activities in Texas from those elsewhere, this petition affords no data to do it. . . . It is more reasonable to do as the Texas statute has done, to consider that in making sales and realizing income in Texas all the capital the

seller has used in preparing the goods for sale has contributed to the result."

In the case of Ford Motor Co. v. Beauchamp et al., supra, the statute of Texas was again in review, which imposed a foreign franchise on all corporations, both foreign and domestic. The court there said (p. 336) :

"In a unitary enterprise, property outside the state, when correlated in use with property within the state, necessarily affects the worth of the privilege within the state. . . . The weight, in determining the value of the intrastate privilege, given the property beyond the state boundaries is but a recognition of the very real effect its existence has upon the value of the privilege granted within the taxing state."

We cannot escape the conclusion that the business is a unitary business. The Ford Motor Company is authorized to "manufacture and sell" automobiles in Pennsylvania. Purchasing materials to make parts is an essential and inherent part of the manufacture of the parts. If the corporation instead of buying steel or glass, cement or paint, chooses to manufacture those articles for use in making the automobiles, the acquiring of the articles by manufacture rather than purchase is no less an essential part of the manufacturing business. Certainly the making of glass for automobile windows could not be dissociated from the manufacture of the automobiles if that was the only way in which the company acquired the glass; so the making of radiator cores instead of purchasing them is upon the same basis.

In the testimony of the auditor for defendant, he was asked:

"Q. . . . Would it be possible for you to sell your cars in Pennsylvania without the manufacturing activities and assets at other places?

A. No, it would not.

.    .    .    .    .    .    .    .    .    .    .    .

Q. Is the assembling or manufacturing of automobiles at Chester a final step in the production of the Ford Motor Car?

A. Yes."

The Pennsylvania business is the final step to realize the returns from the other business of the company.

We, therefore, find that the business of the Ford Motor Car Company is a unitary business.

It would seem from the language of the decisions last grouped, and especially the Beauchamp case last cited, to which should be added the language of our own case, Commonwealth v. Columbia Gas & Electric Co., supra, and Great Atlantic & Pacific Tea Co. et al. v. Grosjean et al., supra, that in determining the value of a franchise there is nothing inherently unconstitutional in applying a formula which takes into consideration the capital outside the State in attempting to arrive at the proportion taxable in the State.

3. Defendant, however, contends that the principles above enunciated do not apply if the taxpayer, with reasonable certainty, shows what proportion of the property and capital stock calculated on a mathematical basis should be allocated to the business in the State, and that any overreaching beyond those figures is unconstitutional, even in the application of a franchise tax. This of course does not take into account any intangible benefit that may be reflected by the great activities outside of the State upon the franchise exercised in the State.

Upon this subject Mr. Justice Cardozo, in Norfolk & Western Railway Co. v. North Carolina ex rel., 297 U. S. 682, which involved a formula for an income tax that took into consideration gross operating revenues and mileage, said (pp. 684, 685) :

"A division of revenues and costs in accordance with state lines can never be made for a unitary business with more than approximate correctness. There is a tendency, none the less, for rates to be so adjusted to

expenses over different portions of a system as to produce, when averages are considered, a uniformity of net return, or a fair approach thereto. . . . Taxpayer and state would be swamped with administrative difficulties if left to struggle through every case without the aid of a formula of ready application. In the perplexities besetting the process of assessment the statute is the outcome of a reasonable endeavor to arrive at a proportion of general validity." And also at page 686:

"Appellant now insists, as it insisted in the courts below, that the operating expenses for its North Carolina branches were far in excess of those allowed by the Commissioner, who refused to depart from the statutory formula. There is evidence in the record giving support to that position, though its weight is contested by counsel for the state." And he continued, page 688:

"We are unable to accept the argument for the appellant that its burden was discharged when it gave evidence of the ratio between actual and average expenses while keeping silent as to the ratio between actual and average receipts. The statutory formula is not framed on an assumption that gross operating revenues are uniform actually for every mile throughout the system. . . . The implications of the formula being what they are, a taxpayer does not escape the application of the statute by evidence directed to only one of the related terms. Its evidence to be effective must be directed to each of them alike, for only thus can the assumed relation between them be proved to be unreal."

In Maxwell, etc., v. Kent-Coffey Mfg. Co., 204 N. C. 365, 168 S. E. 397, 297 U. S. 682, defendant contends that the effect of that case is that if evidence had been offered, such as has been offered in the instant case, the court would have declared the application of the formula unconstitutional. It is said in 168 S. E. 400:

"No effort was made in the evidence to break up the business of appellee into the separate or component ele-

ments of buying, manufacturing, and selling, as was done in the Hans Rees' Sons Case. . . . But the tax here imposed is not one upon the capital stock of the corporation or its franchise. . . . The tax here in question is one upon income or net profits. . . . The appellee relies upon Maxwell v. Hans Rees' Sons, supra, as supporting its contentions. The difference is that in the Hans Rees case, evidence was presented breaking up the business into the separate elements of buying, manufacturing, and selling. No effort of that kind was made in the instant case."

In Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113, the court said (p. 120) :

"The profits of the corporation were largely earned by a series of transactions beginning with manufacture in Connecticut and ending with sale in other States. In this it was typical of a large part of the manufacturing business conducted in the State."

It was contended that the tax was unconstitutional because the business outside the State yielded net profits of more than a million dollars, while only $42,942.18 was applicable to Connecticut; while under the method of apportionment, 47 percent of its net income was brought into Connecticut for taxation. The court said (p. 121) :

" 'The plaintiff's argument on this branch of the case,' as stated by the Supreme Court of Errors, 'carries the burden of showing that 47 per cent. of its net income is not reasonably attributable, for purposes of taxation, to the manufacture of products from the sale of which 80 per cent. of its gross earnings was derived after paying manufacturing costs.' The corporation has not even attempted to show this; and for aught that appears the percentage of net profits earned in Connecticut may have been much larger than 47 per cent. There is, consequently, nothing in this record to show that the method of apportionment adopted by the State was inherently arbitrary, or that its application

to this corporation produced an unreasonable result."

In the case of Bass, Ratcliff & Gretton, Ltd., v. State Tax Commission, 266 U. S. 271, the court said (p. 282) :

"So in the present case we are of opinion that, as the Company carried on the unitary business of manufacturing and selling ale, in which its profits were earned by a series of transactions beginning with the manufacture in England and ending in sales in New York and other places—the process of manufacturing resulting in no profits until it ends in sales—the State was justified in attributing to New York a just proportion of the profits earned by the Company from such unitary business."

But the court also said (p. 283) :

"It is not shown in the present case, any more than in the *Underwood Case*, that this application of the statutory method of apportionment has produced an unreasonable result. The fact that the Company may not have had any net income upon which it was subject to payment of income tax to the Federal Government, obviously does not show that it received no net income from the business which it carried on in New York. There is no evidence in the record as to whether the Company received any net income from its New York business, or the amount of the profit and loss on that business, if any, either considered separately or in connection with the manufacturing business carried on in Great Britain."

The case of Montgomery Ward & Co. v. State Tax Comm., 98 P.(2d) 143, involved an income tax. The company operated chain stores throughout the country, some of which were in Kansas. All purchasing for the Kansas stores was done in Chicago and New York. All merchandise was supplied from a warehouse in Missouri. The supervision, management, and other administrative services were furnished from outside the State. The tax was assessed upon total sales made in Kansas, less cost of goods and local ex-

pense of operation. The company insisted that the entire net income thus arrived at was not derived from transactions in Kansas. The company presented figures from which it fairly appeared that 85 percent of the net income should be allocated to Kansas and 15 percent of it outside. The court sustained the company's contention.

In the case of S. S. Kresge Co. v. Bennett et al., 51 F.(2d) 353, affirmed 287 U. S. 565, a Michigan corporation owned and operated about four hundred retail stores, of which 40 were in New York. It manufactured no goods, but maintained a purchasing department for the entire system conducted in New York. It operated a purchasing department, and an importing and jobbing department in New York. The purchasing department and executive offices were in Michigan. The company charged to each store the invoice cost of goods, to which were added two percent and five percent of the invoice cost to cover central organization, and two percent of the gross sales of each store were charged against it for overhead expenses. The court held that that evidence was not sufficient to show, with reasonable accuracy, the net income earned from the activities in New York, and it was said (pp. 354, 356, and 355) :

"We think it is a sufficient answer to this contention: (1) That the plaintiff has not, in the record before us, shown the net income from New York State, and (2) that the proceedings before the commission were not sufficient to sustain this action. . . .

"Upon all the evidence offered to the commission the latter could not have determined the taxes in accordance with the method now claimed by the plaintiff. . . .

"Since the plaintiff cannot show by the facts before us what was its net income from New York State, but can merely estimate it, we do not think that there is anything before us to sustain the contention that the method of apportionment adopted by the commission

was unconstitutional. If the actual net income from the state cannot be demonstrated with reasonable certainty, the commission can properly be intrusted with some discretion in determining what method to use in approximating it."

This last quotation leads us to the proposition whether, if the converse is true, and the taxpayer can show "the actual net income from the State . . . with reasonable certainty," the formula is unconstitutional when it brings in the whole capital stock to be applied to the allocation fractions, for ascertaining the tax to be paid on the privilege of doing business.

To adopt this latter contention is squarely in the teeth of the language used in the Columbia Gas & Electric Corp. case, where the court said (p. 221):

"These fractions, as stated above, concern corporate activity. While they bear some relation to capital stock value, intrinsically they determine the taxable value of the corporate activity within this State rather than of the property located here. That it is the value of the franchise rather than the actual value of the property which is taken into account is clear from the factors which enter into the apportionment. . . . It does not ascertain physical worth of assets located in this State, but arrives at a value which the functional or operating organic unit within this State possesses. It represents what the right to do business is worth."

It also conflicts with the language of Great Atlantic & Pacific Tea Co. et al. v. Grosjean et al., supra, quoted above, where it is said (p. 425):

"The law rates the privilege enjoyed in Louisiana according to the nature and extent of that privilege in the light of the advantages, the capacity, and the competitive ability of the chain's stores in Louisiana considered not by themselves, as if they constituted the whole organization, but in their setting as integral parts of a much larger organization."

If we deny defendant's proposition of law, we are still within the statement made in Southern Realty

Corp. et al. v. McCallum et al., supra, wherein it is said (p. 936) :

"That a state may impose such a franchise or business privilege tax, and may measure it by the capital stock and surplus used by the corporation in its business or by its income therefrom, although business is done in more states than one, without unconstitutional interference with interstate commerce or other federal prerogative and without a taxing of property beyond the jurisdiction of the taxing state, when the capital by which the tax is measured is reasonably apportioned according to the business there done, is settled by many decisions."

We have found that the Ford Motor Company can segregate with reasonable mathematical accuracy the proportion of its tangible property, wages and salaries, and gross receipts attributable to the business in Pennsylvania. This calculation, however, does not take into consideration the business in Pennsylvania as reflected in its "setting as integral parts of a much larger organization," as stated in Great Atlantic & Pacific Tea Co. et al. v. Grosjean et al., supra, and does not include anything which, in the language of the Supreme Court in the Columbia Gas case, has any "degree of correlation as to situs with tangibles." The latter case held (p. 220) that: "It was undoubtedly within the power of the legislature to permit this correlation to be worked out through the use of a fraction which considered tangible assets only, leaving a more exact correspondence to be brought about through the interaction and effect of the other fractions composed of gross receipts and payrolls." As we understand the effect of the latter case, we are forced to conclude that the method employed of using the whole tangible property and the total wages and salaries and the total gross receipts as the denominator, and the whole capital stock as the multiplicand in the allocation fractions, is not unconstitutional.

*Conclusions of law*

1. Section 21(*b*) of the Act of June 1, 1889, P. L. 420, as amended by the Act of May 16, 1935, P. L. 184, imposes a franchise tax upon foreign corporations for the privilege of doing business in the Commonwealth of Pennsylvania.

2. The said statute is not unconstitutional as offending against the equal protection clause or the due process clause of the Federal Constitution, or the uniformity clause of the Constitution of Pennsylvania.

3. The said statute does not violate the Constitution of Pennsylvania in that it deprives defendant of its property, contrary to the law of the land, by imposing a tax upon the property of defendant which has its situs beyond the taxing jurisdiction of the Commonwealth.

4. The settlement appealed from is not unconstitutional, either under the equal protection clause or the due process clause of the Federal Constitution, or the uniformity clause of the Constitution of Pennsylvania.

5. Defendant being engaged in a unitary business consisting of four lines of activities, two of which are performed and consummated within the Commonwealth of Pennsylvania, it is not unconstitutional to use the value of all the tangible property, the total wages, salaries, and compensation to employes, and the total gross receipts as the denominators of the respective allocation fractions prescribed by the statute to ascertain the value of the franchise in Pennsylvania.

6. In order to settle a valid tax against defendant, the Commonwealth is not required to use as the denominator of the three fractions only so much of the tangible property, the total wages, salaries, and compensation to employes, and of the gross receipts as is directly and mathematically attributable to the two lines of activities performed in the Commonwealth of Pennsylvania.

7. Defendant being engaged in a unitary business, it is not unconstitutional to use as the multiplicand for the allocation fractions defined by the act the value of the whole capital stock of all kinds of defendant.

8. The Commonwealth is not required to use as the multiplicand for the allocation fractions only so much of the capital stock as is directly and mathematically attributable to the two phases of the company's business performed in Pennsylvania.

9. The resettlement made by the accounting officers is valid.

### Statement

Balance Due .......................... $57,215.38
Interest from February 19, 1939, being 60
    days after the resettlement ...........   7,676.40

                                              $64,891.78

### Attorney General's Commission

Five percent on $10,000.00 ........ $500.00
One percent on $54,891.78 ........  548.92
                                       ————   1,048.92

    Total............................ $65,940.70

And now, May 14, 1941, judgment is hereby directed to be entered in favor of the Commonwealth and against the Ford Motor Company for $65,940.70, unless exceptions be filed within the time limited by law.

HARGEST, P. J., April 27, 1942.—This case involves an appeal from the settlement of a foreign franchise tax, imposed by section 21(b) of the Foreign Franchise Tax Act of May 16, 1935, P. L. 184, 72 PS §1871. We sustained the tax (51 Dauph. 149), and to our opinion and findings defendant has filed 56 exceptions.

The case involves, among other things, the question as to whether defendant is engaged in a unitary business. For the reasons given in our first opinion we are

entirely satisfied that our conclusion in that respect is correct, and we will not further discusss that phase of the case. This opinion upon the exceptions will deal with the assumption that the corporation is so engaged.

Defendant's contentions are:

1. That even though the corporation be engaged in a unitary business, the entire value of its capital stock should not be included in the measure for this franchise tax;

2. That the United States securities and the shares of subsidiary corporations cannot be constitutionally included in the value of the capital stock which is used as the multiplicand of the fraction to obtain the taxable value of the franchise, because thus to apply the statutory formula would bring into the State for tax purposes property located outside of the State; and

3. The settlement violates the equal protection clause of the Fourteenth Amendment in that there is an inequality of treatment between domestic and foreign corporations, and is a violation of the contract between defendant and the Commonwealth, under which defendant came into the State.

The Foreign Franchise Tax of 1935 fixes the tax at the rate of five mills, to be ascertained by a formula which requires the application of three fractions; one being the tangible property in the State over the total tangible property, the second the payroll in the State over the total payroll, and the third the gross receipts in the State over the total gross receipts, each multiplied by one third "of its whole capital stock of all kinds," the sum of the quotients being the taxable value of the franchise.

Defendant contends that it is unconstitutional to take as the denominators of the fractions the whole tangible property, the total payroll, and the entire gross receipts, and as the multiplicand the value of the entire capital stock, and that only such portion of these factors as is directly applicable to the business in Pennsylvania may be used. It is contended that instead of the whole

capital stock, valued at $498,428,150, only $90,000,000 which, according to its bookkeeping methods, is attributable to the assembling and selling part of its business done in the State, should be used as the multiplicand, and that, according to its calculation, the taxable value should be $6,434,830, instead of $17,694,184.

This case is difficult. We are in the mental state expressed by Judge Sibley, of the Circuit Court of Appeals for the Fifth Circuit, in the case of Stone v. Interstate Natural Gas Co., 103 F.(2) 544, 549:

"The recent reexamination of the basis for such immunities [from taxation] has resulted in an upheaval. The current of authority has been turned. For the judicial navigator the cases are no longer the beacons marking out a fixed if tortuous channel. He must for awhile fix his eyes anew upon the Constitution as the pole star of his firmament and steer his course rather by principle than by precedent."

To change Judge Sibley's metaphor, we find ourselves in a maze created by apparently applicable judicial battles which leave the road to our present judicial objective neither straight nor clear. The confusion is caused by such conflicts as Commonwealth v. Columbia Gas & Electric Corp., 336 Pa. 209, Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113, Bass, Ratcliff & Gretton, Ltd., v. State Tax Commission, 266 U. S. 271, Ford Motor Co. v. Clark et al., 100 F.(2d) 515, Ford Motor Co. v. Beauchamp et al., 308 U. S. 331, Atlantic Refining Co. v. Virginia, 302 U. S. 22, North American Cement Corp. v. Graves et al., 269 N. Y. 507, 199 N. E. 510, affirmed in 299 U. S. 517, and Butler Bros. v. McColgan, 17 Cal. (2d) 664, 111 P.(2d) 334, on the one side, and Hans Rees' Sons v. North Carolina ex rel., 283 U. S. 123, and Wallace et al. v. Hines et al., 253 U. S. 66, on the other. All these cases, except the Graves case, have been considered in our original opinion.

Because of the great importance of this case, we review the most pertinent of these cases.

In the first place, being reversed in the case of Commonwealth v. Columbia Gas & Electric Corp., supra, when we declared the act in question unconstitutional, we followed in the instant case what we considered to be the instructions of our own Supreme Court in that case; but defendant insists that we have erroneously interpreted those directions. Secondly, we took the route mapped out by the cases of Underwood Typewriter Co., Ford Motor Co. v. Clarke et al., Ford Motor Co. v. Beauchamp et al., and Bass, Ratcliff & Gretton, Ltd., supra; but defendant insists that we were misguided as to that route and should have followed the one which it contends was made clear for us by the cases of Wallace v. Hines et al., and Hans Rees' Sons v. North Carolina ex rel., supra.

1. Should the entire value of the capital stock be included in the measure to ascertain this franchise tax?

The first answer to this question is found in the statute itself, which provides that the formula should be applied to "each dollar of the actual value of its whole capital stock of all kinds, including common, special and preferred." In our opinion, in the case of Commonwealth v. Columbia Gas & Electric Corp., 47 Dauph. 133, we held the act unconstitutional. The Supreme Court of Pennsylvania reversed and sustained the act, but held the application of it to the Columbia Gas & Electric Corporation invalid. So the only question remains whether the application in the instant case is in violation of constitutional provisions.

We think that the opinion of the Supreme Court in the Columbia Gas case lays down the fundamental rule that so much of the capital stock value as is represented by either tangible or intangible property which is concerned with or bears some relation to the scheme of corporate activity performed in the State should be considered in making up the fractions for ascertaining the value of the franchise. On the other hand, if the business is multiform, and if there be securities which have

no relation to the business done in the State, they should be excluded. It must be always kept in mind that this tax is not upon the capital stock as such but is a tax for the privilege of doing business in the State. And it must be also kept in mind that there is a distinction with reference to corporations engaged in a multiform business and those engaged in a unitary business.

In the Columbia Gas case, the Supreme Court said, with reference to the act (p. 221):

"These fractions, as stated above, concern corporate activity. While they bear some relation to capital stock value, intrinsically they determine the taxable value of the corporate activity within this State rather than of the property located here. That it is the value of the franchise rather than the actual value of the property which is taken into account is clear from the factors which enter into the apportionment. . . . It does not ascertain physical worth of assets located in this State, but arrives at a value which the functional or operating organic unit within this State possesses. . . .

"In applying the formula . . . since the value of the capital stock is used as a measure, the taxable value of the franchise must have some relation to the business done in the taxing state. . . . the property without the state may be taken into consideration only if it is an organic or functional part of that within the state. . . . *Where the intangibles are a necessary part of the corporate activity and are within the scheme of corporate functioning, actively or as reserve, there is no reason why they should not be included.* . . . Viewing the Act as a whole it cannot be declared to violate either the Federal or State Constitutions or to be so inherently arbitrary as to render it unconstitutional." (Italics supplied.)

And at page 224:

"Under the principles relating to corporations engaging in multiform business and considering that only part of appellee's business is conducted in Pennsylva-

nia, as far as the capital stock value is related to tangible and intangible property, only such tangibles and intangibles should be taken into account as are concerned with the functions exercised within the state."

At page 225:

"By these principles it is obvious that since the tax is nothing but one upon the value of a privilege and the taxable measure is fundamentally the capital stock used in connection with that privilege, we must for the purpose of determining the validity of the tax separate from it that capital stock value which bears no relation to the privilege."

Having found that the Ford Company is doing a unitary business, we conclude that the foregoing quotation, as it applies to a unitary business, is binding.

In Commonwealth v. Foerderer's Estate, 50 Dauph. 428, this court, in an opinion by Judge Richards, also interpreted the act in question. There defendant, a Delaware corporation, was authorized to do business in Pennsylvania as a holder of and dealer in securities for the year in question. All its tangible property was located in this State, all its wages and salaries paid here, and all its gross receipts received here. The taxing officers refused to allow certain deductions which by law would have been allowed to domestic corporations. The valuation of the capital stock was not challenged, one third of it was used as the multiplicand of each allocation fraction, and it was not disputed that the fractions were correct. Applying the opinion of the Supreme Court in the Columbia Gas case, which appellant admitted was controlling, we sustained the settlement, although the Commonwealth conceded that defendant would have been required to pay somewhat less had it been a domestic corporation, but contended that this was an isolated case which could not affect the constitutionality of the system or the legality of the particular settlement.

We also applied the principle of the Columbia Gas case in the case of Commonwealth v. The Mundy Corp.,

51 Dauph. 195. In that case the corporation was registered "to do a real estate, construction, and contracting business in Pennsylvania. It actually engaged in the real estate business during 1935, but did not engage in any contracting or construction work." It owned securities of a value of more than $800,000, the bulk of which had been obtained years before, and there was no selling or dealing in securities. This court, in an opinion by Judge Richards, held that the securities had no relation to any function or business performed within the State and should be excluded from the capital stock valuation.

The situation in the instant case is quite different. The corporation has a capital stock value of $498,-428,150, which includes $64,849,576 of the shares of subsidiary companies, in all but four of which defendant owns the entire capital stock. It also includes United States securities of $82,026,813. So far as the subsidiary companies are concerned, they are corporations which contribute to the unitary business of defendant company. In other words, to do the same amount of business if defendant's capital were not invested in the subsidiaries which furnished to it raw materials, it would in all probability have to invest directly the same amount of capital.

The very magnitude of defendant's business requires the maintenance of large reserves and liquid securities, not only to stabilize the business but to maintain prices where it is desirable. This also affects the goodwill of the business and relates to defendant's business status in Pennsylvania as well as in other States.

2, 3. This brings us to a consideration as to whether, under the authorities, these assets should be included in the valuation to which the statutory formula is applied.

We are earnestly asked to review the cases of Wallace et al. v. Hines et al., and Hans Rees' Sons v. North Carolina ex rel., supra, but that service has been largely

performed for us by the Supreme Court of the United States in the case of Butler Bros. v. McColgan, 111 P.(2d) 334, 17 Cal. App. (2d) .664, 315 U. S. 501.

The Butler case involved the application of the Franchise Tax Act of California, which required: "The portion of net income derived from business done within this State, shall be determined by an allocation upon the basis of sales, purchases, expenses of manufacturer, payroll, value and situs of tangible property, or by reference to these or other factors, or by such other method of allocation as is fairly calculated to assign to the State the portion of net income reasonably attributable to the business done within this State." The corporation, engaged in the wholesale dry goods and general merchandising business, operated seven wholesale distributing houses, one of which was in California at San Francisco. For the tax year of 1935 the San Francisco house operated at a loss of $82,851, while the operations of all the houses produced a profit of $1,-149,677. The tax of $3,798.43 was assessed, which was predicated upon an allocation to California of 8.1372 percent of the total income of the company. The District Court of Appeals reversed the Superior Court which had sustained the tax and directed judgment to be entered in favor of appellant (102 P.(2d) 776), relying upon the Hans Rees' Sons case. When the case reached the Supreme Court of California that court, in an elaborate opinion, sustained the tax, giving greater emphasis to the cases of Underwood Typewriter Co. and Bass, Ratcliff & Gretton, Ltd., supra. The court said in its opinion that "The appellant relies heavily upon Hans Rees Sons v. State of North Carolina," and then distinguished that case. The California Supreme Court refused a reargument.

We have before us the appellant's brief in the Supreme Court of the United States. All the questions raised by defendant in the instant case were raised in the Butler case, except the discriminations against for-

eign corporations and the violation of the contract between the State of Pennsylvania and defendant.

The brief referred to says:

"Asserting reliance upon Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113, Bass, Ratcliff & Gretton v. State Tax Commission, 266 U. S. 271, and North American Cement Corporation v. Graves, 299 U. S. 123, the court below considered appellant's business to be 'unitary,' held the statutory formula method of allocating income to California to be mandatory and the statute and the consequent tax to be valid.

"The court further considered that the decision of this court in Hans Rees' Sons, Incorporated, v. North Carolina, 283 U. S. 123, did not control."

The brief then entered into an elaborate discussion of the Hans Rees case, saying, inter alia:

"We submit that the decision below cannot be sustained consistently with the decision of this court in Hans Rees' Sons, Incorporated, v. North Carolina, 283 U. S. 123. . . .

". . . In view of Appellee's insistence in this regard (upon the Underwood, Bass, and Graves cases) we deem it necessary to discuss those cases at some length" (which the brief then does).

It also analyzes Wallace et al. v. Hines et al., which defendant here asks us to review.

The brief argues that appellant's business is not a unitary business, quoting the same cases to which we have referred in our previous opinion, and continues:

"The opinion and reasoning of the State court in the Rees case closely resembles that of the court below in the instant case—even though, from the standpoint of the question of a 'unitary' business, the instant case with its separate branch houses is far removed from the manufacturing business in the Rees case. . . ."

It then uses the same reasoning which defendant here uses, namely, that only two branches of its business can be considered for taxation:

"Where the business operations of a taxpayer doing business in several States are of a separate and individual character sufficiently so that the·result of its operation can be reasonably and accurately determined by itself then the tax can constitutionally be laid only with respect to the actual income within the State."

And, arguing that the fact that the tax is an excise tax is immaterial, the brief concludes:

"The facts as stipulated require a decision in appellant's favor if the case is to be decided consistently with the principles announced in the Rees case. . . .

"We do not understand that this court regards the Rees case as overruled or shaken in any way by any of its later decisions. As we understand it, in the North American Cement case the State accepted the Rees case without question, and argued the case upon the ground that it came within the principles of the Underwood and Bass cases rather than the Rees case. The per curiam decision indicates such to be the case. Under the Rees case, the judgment below, we insist, must be reversed."

The Supreme Court of the United States said in Butler Bros. v. McColgan, etc., 315 U. S. 501, 506:

"Hans Rees' Sons v. North Carolina, 283 U. S. 123 [75 L. ed. 879, 51 Sup. Ct. 385], constitutes appellant's chief support in its attack on the formula employed and the tax imposed by California. Appellant maintains that the use of the formula in question resulted in converting a loss of $82,851 into a profit of over $93,500 and that the difference of some $175,000 has either been created out of nothing or has been appropriated by California from other states.

"We take a different view. We read the statute as calling for a method of allocation which is 'fairly calculated' to assign to California that portion of the net income 'reasonably attributable' to the business done there. The test, not here challenged, which has been reflected in prior decisions of this Court, is certainly not

more exacting. *Bass, Ratcliff & Gretton, Ltd., v. Tax Commission*, 266 U. S. 271 [69 L. ed. 282, 45 Sup. Ct. 82]; *Ford Motor Co. v. Beauchamp*, 308 U. S. 331 [84 L. ed. 304, 60 Sup. Ct. 273]. Hence, if the formula which was employed meets those standards, any constitutional question arising under the Fourteenth Amendment is at an end."

And at page 508:

"As aptly stated by the Supreme Court of California, 'If the omission of the California sales would have no effect on the purchasing power, the omission of sales in an equal amount wherever made would likewise have no effect on the company's ability to purchase at a saving. Thus, by proceeding in turn from state to state, it could be shown that none of the sales in any of the states should be credited with the income resulting from the purchasing of goods in large quantities.' Nor are there any facts shown which permit the conclusion that the other advantages of centralized management (*Great Atlantic & Pacific Tea Co. v. Grosjean*, supra) are attributable to other branches but not to the one in California. . . . At least in absence of that proof, California was justified in assuming that the San Francisco branch contributed its aliquot share to the advantages of centralized management of this unitary enterprise and to the net income earned.

"We cannot say that property, pay roll, and sales are inappropriate ingredients of an apportionment formula. We agree with the Supreme Court of California that these factors may properly be deemed to reflect 'the relative contribution of the activities in the various states to the production of the total unitary income,' so as to allocate to California its just proportion of the profits earned by appellant from this unitary business. And no showing has been made that income unconnected with the unitary business has been used in the formula.

". . . Appellant in its petition for rehearing before the Supreme Court of California relied on that part of

the stipulation in urging that the cause be remanded for a further hearing since that Court concluded that 'appellant has not furnished any explanation of why its California business differs so from the average that the formula produced an erroneous result.' The petition for rehearing was denied. Appellant now asserts that it has been denied procedural due process under the rule of *Saunders v. Shaw*, 244 U. S. 317. We do not agree."

At the expense of brevity we have referred both to the brief and the opinion in the United States Supreme Court to show that in the Butler case the Rees case was not, and in the instant case should not be, controlling.

The Graves case, supra, was decided upon the authority of the Bass case, although the taxpayer showed, according to the separate accounting, that much less income should be allocated to the taxing State. It was affirmed by a memorandum per curiam opinion in the Appellate Division of the New York Supreme Court, in the New York Court of Appeals, and in the Supreme Court of the United States. The taxpayer, a foreign corporation, owned and operated three cement plants and one lime plant and sold the products thereof. Two of the cement plants were in New York, one in Maryland, and the lime plant in West Virginia. The four plants were operated separately and the products sold in separate districts. The corporation kept separate accounts for them, and sold very little of the output of the West Virginia and Maryland plants in New York. The tax commission allocated the net income of the corporation by one formula, the property factor, for the years in question. By this means, large incomes were allocated to New York for each of those years. The corporation, by an elaborate separate accounting system, showed that for 1925 the New York income was much less than that allocated to the State by the formula and for the years 1926, 1927, and 1929 large losses were sustained from the New York business, instead of deriving from New York the income allocated to it by the formula. In the

face of this evidence, the Supreme Court of the United States, affirming the New York appellate courts, sustained the tax under the formula. The California court, in the Butler case, reviewing the New York case, said (111 P.(2d) 340):

"The significance of this decision on two points involved in the instant case is readily apparent: (1) it holds that the operations of four separate manufacturing plants, one of them making a different product from different materials than the others, are so interrelated as properly to be treated as unitary; (2) it holds that separate accounting in accordance with recognized accounting practice is insufficient evidence to disprove the propriety and presumption of fairness of formula allocation."

We said in Commonwealth v. Shattuck Co., 52 Dauph. 190, 208:

"It is difficult to square the North American Cement case [Graves] with the Hans Rees' case. In the Hans Rees' case the company prevailed because of a distinct separate accounting, which clearly showed the corporate activity and income attributable to the State, but, in the North American Cement Corp. case, there was a separate accounting to show the same thing, yet the tax was sustained."

In Ford Motor Co. v. Clark et al., 100 F.(2d) 515, the statute imposed a franchise tax upon the proportion which the capital, surplus, and undivided profits, plus outstanding notes and bonds running for more than a year upon gross receipts from business done in Texas the previous year, bore to the total gross receipts. The Texas business was 3.858 percent of the whole. The company's return showed: "Total capital actually located in or used in connection with business done in Texas, $3,079,417." The percentage applied to the total capital amounted to $23,157,705. The tax was protested on the ground that the capital was invested and used in various ways and the total capital included

State and municipal securities. The court said, at pages 517 and 518, after referring to the case of Great Atlantic & Pacific Tea Co. et al. v. Grosjean et al., 301 U. S. 412:

"When business is done also in other states, so that the business potency inherent in the capital is thus divided, it is not arbitrary to apportion the capital which is to measure the tax in proportion to the income realized in the taxing State. Nor do we think the fact that manufacture in another State of the thing sold renders the measure of the tax unreasonable. The object of the whole corporate enterprise is to make money. The corporation has made none by manufacture until it sells the product. If it chooses to sell in Texas, and extract cash from Texas, with the great advantage that manufacturing its own wares gives in competition with those who do not manufacture, it is not unreasonable to regard the potency of the capital used in manufacture as following proportionately the goods offered for sale in Texas. . . .

"Cases cited on the taxation of income such as Hans Rees' Sons v. North Carolina . . . are irrelevant."

This case reached the Supreme Court of the United States under the title of Ford Motor Co. v. Beauchamp et al., 308 U. S. 331, and was affirmed, in a brief opinion, in which the Bass case is referred to and the Underwood Typewriter case cited in a note, but the Hans Rees' Sons case was not cited. The Supreme Court quotes from the Grosjean case, supra, page 337, what we quoted in our previous opinion, as follows:

" 'The law rates the privilege enjoyed in Louisiana according to the nature and extent of that privilege in the light of the advantages, the capacity, and the competitive ability of the chain's stores in Louisiana considered not by themselves, as if they constituted the whole organization, but in their setting as integral parts of a much larger organization.' This same rule applies here."

And a motion for a rehearing was denied, 308 U. S. 640.

We are asked by appellant to review again the Hines case. In that case the statute of North Dakota was attacked, which imposed a special excise tax for doing business. The tax, in the case of railroad and other public utility companies, was imposed on "that proportion of the entire property of such corporation engaged in such business which its mileage within the State bears to its entire mileage within and without the State." The court said (p. 69):

"North Dakota is a State of plains, very different from the other States, and the cost of the roads there was much less than it was in mountainous regions that the roads had to traverse. The State is mainly agricultural. Its markets are outside its boundaries and most of the distributing centers from which it purchases also are outside. It naturally follows that the great and very valuable terminals of the roads are in other States. So looking only to the physical track the injustice of assuming the value to be evenly distributed according to main track mileage is plain."

To use another illustration: Let us assume that a railroad with extremely valuable terminals in New York City which were reached by subways under the Hudson River extended across the whole northern part of Pennsylvania, touching only a few small cities, with another extremely valuable terminal in Cleveland, Ohio, it would be seen at once that the large part of the mileage would be in Pennsylvania, but it would be grossly outrageous to predicate any franchise tax alone upon the mileage of such a railroad.

The statute of North Dakota provided as to corporations other than public utilities, that the tax was upon (Wallace et al. v. Hines et al., supra, p. 68) "that proportion of its entire stock and bond issues which its business within the State bears to its total business within and without the State, and where such business

within the State is not otherwise more easily and certainly separable from such entire business within and without the State, business within the State shall be held to mean such proportion of the entire business within and without the State, as the property of such corporation within the State bears to its entire property employed in such business both within and without the State."

In Ford Motor Co. v. Clark et al., supra, referring to Wallace et al. v. Hines et al., it is said (p. 518) :

"Had the apportionment for railroads been like that for other corporations, on the basis of business done, as here, we apprehend the result would have been otherwise. Compare Bass, Ratcliff & Gretton v. State Tax Commission, 266 U. S. 271, 45 S. Ct. 82, 69 L. ed. 282."

We felt constrained to hold in our previous opinion that notwithstanding the company, by its system of accounting, attempted to separate the proportion of its capital stock mathematically attributable to the two lines of activities performed in the Commonwealth, it was not invalid to use the whole capital stock as the multiplicand in the apportionment fractions required under the statute.

In the Butler Bros. v. McColgan case, supra, the Supreme Court of the United States said (p. 507) :

"It is true that appellant's separate accounting system for its San Francisco branch attributed no net income to California. But we need not impeach the integrity of that accounting system to say that it does not prove appellant's assertion that extraterritorial values are being taxed. Accounting practices for income statements may vary considerably according to the problem at hand. Sanders, Hatfield & Moore, A Statement of Accounting Principles (1938), p. 26. A particular accounting system, though useful or necessary as a business aid, may not fit the different requirements when a State seeks to tax values created by business within its borders. Cf. Hamilton, Cost as a Standard for Price,

4 Law & Contemporary Problems 321. That may be due to the fact, as stated by Mr. Justice Brandeis in *Underwood Typewriter Co. v. Chamberlain*, 254 U. S. 113, 121, that a State in attempting to place upon a business extending into several States 'its fair share of the burden of taxation' is 'faced with the impossibility of allocating specifically the profits earned by the processes conducted within its borders.' Furthermore, the particular system used may not reveal the facts basic to the State's determination. *Bass, Ratcliff & Gretton, Ltd., v. Tax Commission*, supra, p. 283. In either aspect of the matter, the results of the accounting system employed by appellant do not impeach the validity or propriety of the formula which California has applied here."

Upon this branch we have already referred to the Graves case.

We, therefore, adhere to our previous ruling that even though the company has attempted to allocate the proportion of the capital stock which is assignable to the two activities performed in the State, it does not preclude the Commonwealth from using as the multiplicand of the allocation fractions one third of the company's whole capital stock.

Defendant contends that the equal protection clause of the Fourteenth Amendment is violated, because there is an inequality of treatment between domestic and foreign corporations, and a violation of the contract between defendant and the Commonwealth.

The Commonwealth offered exhibit no. 3 showing what the capital stock tax would have been if the Ford Motor Company were a domestic corporation. According to the calculation based on the company's own figures, such tax would have been approximately $874,-624.28. The present tax appealed from is $88,470.92. The capital stock tax imposed upon domestic corporations is laid directly upon the capital stock, whereas the franchise tax under the act in question is imposed on the privilege and not upon the capital stock.

In Concordia Fire Ins. Co. v. Illinois, 292 U. S. 535, a somewhat similar question arose, and the court said (p. 546) :

"It is said that §30 arbitrarily discriminates against foreign fire, marine and inland navigation insurance corporations and in favor of competing domestic corporations, in that it taxes the net receipts of the former, while the latter are not subjected to such a tax or to any equivalent tax. It appears to be conceded that no tax is laid directly on the net receipts of the domestic corporations; but it is denied that those corporations are not subjected to an equivalent tax."

The Supreme Court of the United States then refers to the vacillating attitude of the Supreme Court of the State with reference to section 30 of the State statute, and distinguishes, to some extent, the case of Hanover Fire Ins. Co. v. Harding, 272 U. S. 494, upon which defendant here relies.

We need not cite authorities to show that a State may classify foreign and domestic corporations differently for the purpose of taxation, provided it does not deal arbitrarily with one or the other class, but defendant insists that, it having been permitted to enter the State under the terms imposed upon it by the statute then in force, the Franchise Act now in question violates the obligation of the contract upon which it entered the State, and is therefore invalid. It relies for that position mainly on the case of Southern Railway Co. v. Greene, 216 U. S. 400.

It is well settled that a State may prescribe the conditions upon which a foreign corporation may enter it to do business therein, and may exact a bonus or fee for that purpose, but we do not understand the Southern Railway case or any other case to hold that, after a foreign corporation comes into the State, having paid a bonus fee upon the capital then employed, the State may not thereafter change the method of taxation provided all foreign corporations are treated

alike, or may not subsequently impose an annual franchise tax for the purpose of carrying on the business within the State and measured by the business done.

In Baltic Mining Co. v. Massachusetts, 231 U. S. 68, 83, it is said:

"A resort to the receipts of property or capital employed in part at least in interstate commerce, when such receipts or capital are not taxed as such but are taken as a mere measure of a tax of lawful authority within the State, has been sustained. *Maine v. Grand Trunk Railway Co.*, 142 U. S. 217; *Provident Institution v. Massachusetts*, 6 Wall. 611; *Hamilton Co. v. Massachusetts*, 6 Wall. 632; *Flint v. Stone-Tracy Co.*, 220 U. S. 107, 162-5; *United States Express Co. v. Minnesota, supra.*

"The right of a State to exclude a foreign corporation from its borders, so long as no principle of the Federal Constitution is violated in such exclusion, has been repeatedly recognized in the decisions of this court, and the right to prescribe conditions upon which a corporation of that character may continue to do business in the State, unless some contract right in favor of the corporation prevents or some constitutional right is denied in the exclusion of such corporation, is but the correlative of the power to exclude."

In Atlantic Refining Co. v. Virginia, supra, distinguishing between companies which have theretofore come into the State and those seeking the privilege to enter, the Court held (syllabus) :

"Virginia statute imposing graded fees on foreign corporations, measured on authorized capital stock, for authority to do business in the State, does not operate arbitrarily and unequally between the appellant and other foreign corporations seeking the same privilege within the State."

And Mr. Justice Brandeis said (pp. 30, 31) : "The value of the privilege acquired is obviously depend-

ent upon the financial resources of the corporation—. not only upon the capital possessed at the time of its admission to do business, but also upon the capital which it will be in a position to secure later through its existing authority to issue additional stock. Obviously, the power inherent in the possession of large financial resources is not dependent upon, or confined to, the place where the assets are located. Compare *Great Atlantic & Pacific Tea Co. v. Grosjean*, 301 U. S. 412. Great power may be exerted by the company in Virginia although it has little property located there. And the value to it of the privilege to exert that power is not necessarily measured by the amount of the property located, or by the amount of the local business done, in Virginia. Moreover, it is immaterial whether the opportunity is availed of or not. The State grants a large privilege. It may demand a corresponding price."

It would be a monstrous proposition if the Ford Motor Company, when it came in the State in its infancy, paid a bonus under the law, that the State could not subsequently impose an additional bonus commensurate with the millions of dollars of business annually done within the State. It would be just as absurd to hold that the State, in the development of its taxing systems, and in the effort to apportion the tax fairly, could not change the bonus tax to a franchise tax to measure the privilege which the Ford Company is annually enjoying, and that if it made such a change, assuming it operated upon all foreign corporations alike, it would be a denial of the equal protection of the laws. We do not understand any case so to hold.

In the case of Turco Paint & Varnish Co. v. Kalodner et al., 320 Pa. 421, the Supreme Court sustained the Corporate Net Income Tax Act, where the income was the fundamental base and the same fractions were used which are in the present statute.

In the case of Commonwealth v. Columbia Gas & Electric Corp., supra, this court declared the statute

unconstitutional for the same reasons which are now urged. The Supreme Court, reversing, in an elaborate opinion, concluded (p. 227) :

"Appellee also contends that the act is invalid because it discriminates against foreign corporations in favor of domestic ones and therefore violates the equal protection clause of the Federal Constitution. It is sufficient answer to say that this is not a tax in addition to one already imposed, but a new tax which will bring foreign corporations up to the same plane of taxation as domestic corporations. It is scarcely necessary to cite authorities that a state may differentiate in its method of taxing between foreign and domestic corporations. See *Concordia Fire Ins. Co. v. People of the State of Illinois*, 292 U. S. 535. If it attempted to impose a greater tax burden on foreign corporations than it did on domestic corporations similarly situated, appellee would have a just cause of complaint.

"The result of the Act's operation is not so obviously wrong and so out of proportion to the business done and property within the State that it can be said to be confiscatory or discriminatory compared with similar domiciliary corporations. In the light of this opinion there is no imposition or unjust burden on this foreign corporation."

In Dole v. Philadelphia et al., 337 Pa. 375, 379, it is stated:

"When the validity of an act or ordinance is attacked and a decision rendered sustaining it, it is fair to assume that all constitutional questions involved have been decided, whether or not they were raised in the pleadings or mentioned in the opinion: *Turco Paint and Varnish Co. v. Kalodner*, 320 Pa. 421 (428)."

We are, therefore, impelled to the conclusion that the Foreign Franchise Tax Act in question is not a violation of either the Constitution of Pennsylvania or the Constitution of the United States for any of the reasons raised in this record.

In the Columbia Gas case, supra, the Supreme Court at the end of its opinion said that it was not necessary to pass upon the claim that there was an unjust discrimination against foreign corporations as to exemptions allowed domestic corporations. It is there said (p. 227):

"The subject matter of the domestic corporation exemptions is the stock of subsidiaries. These no longer enter into the calculation of value of appellee's capital stock. This issue therefore disappears from the case."

We, however, hold that there is no such unjust discrimination in the instant case.

In view of the reasons which we now give, together with those given in the original opinion, and our decisions in the cases of Commonwealth v. The Mundy Corp., 51 Dauph. 195, and Commonwealth v. Foerderer's Estate, supra, we have separately overruled all of the exceptions.

### Judgment

And now, April 27, 1942, judgment nisi entered in favor of the Commonwealth in accordance with our original opinion is hereby affirmed.